**William J. SCOTT, on his own behalf and on behalf of all persons similarly situated, Plaintiff-Appellant,**

v.

**CITY OF HAMMOND, INDIANA, et al., Defendants-Appellees.**

**Nos. 81–2884, 81–2885.**

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1984.

Decided Aug. 16, 1984.

Joseph V. Karaganis & Gail Ltd., Chicago, Ill., for plaintiff-appellant.

Gail C. Ginsberg, Asst. U.S. Atty., Dan K. Webb U.S. Atty., Chicago, Ill., for defendants-appellees.

Before PELL and CUDAHY, Circuit Judges, and CAMPBELL, Senior District Judge.*

PER CURIAM.

In this case, plaintiff-appellant William J. Scott brought suit against various defendants, complaining about the pollution of Lake Michigan which forced Chicago to close its beaches during the summer of 1980. These appeals concern the district court's dismissal of Scott's allegations against the United States Environmental Protection Agency (the "EPA").[1] Because

---

* Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. There were two complaints filed in the district court by Scott against the EPA. The two complaints are identical except that the second contains an allegation designed to cure a jurisdictional defect contained in the first complaint.

we find that the district court erred when it dismissed certain of Scott's claims, we reverse the order of the district court, 530 F.Supp. 288 (D.Ill.1981) in part and remand the case for further proceedings.

## I. Scott's Complaint

Section 505(a)(2) of the Clean Water Act (the "CWA"), 33 U.S.C. § 1365(a)(2), provides for citizen suits against the Administrator of the EPA "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."[2] Scott invoked this section as part of his attempt to combat the discharge of "raw and inadequately treated human fecal material" into Lake Michigan from the Hammond, Indiana area along the shoreline. Complaint ¶ 8.[3]

Scott's complaint states two discrete grievances against the EPA. The first claim challenges the EPA's failure to prescribe a Total Maximum Daily Load ("TMDL") for discharge of pollutants into Lake Michigan.[4] The second claim alleges that the EPA and its administrator "are under a nondiscretionary duty to ensure that water quality standards adopted under the federal act 'protect the public health and welfare.'" Complaint ¶ 27a (quoting CWA § 303(c)(2), 33 U.S.C. § 1313(c)(2)).

The latter duty is being violated, it is alleged, because there are no water quality criteria for hazardous viruses and there is an inadequate standard for hazardous pathogenic bacteria. Both of these biological pollutants are contained in fecal matter which is discharged into Lake Michigan.

## II. Failure to Disapprove Water Quality Standards

Scott alleges in his complaint that the EPA has approved state water quality standards which fail to protect the public health. The first alleged failing is that there is no prescribed standard for viruses even though viruses are a health hazard. The other alleged shortcoming of the existing regulations is that the method of computing allowable concentrations of bacteria permits extremely high one-day discharges of bacteria into Lake Michigan. Scott alleges that failure to correct this situation is a violation of CWA § 303, 33 U.S.C. § 1313 (1976).

To understand fully the trust of the allegations, we shall briefly review the statutory framework. CWA § 303(c) places the primary reliance for developing water quality standards on the states.[5] The EPA reviews a water quality standard promulgated by a State to ensure that it "protect[s] the public health or welfare, en-

The district court dismissed both complaints on the merits. For clarity's sake, and to avoid potential future jurisdictional problems, on remand the district court should proceed under the second complaint and dismiss, without prejudice, the allegations of the first complaint which consist of claims against the EPA.

2. Scott's allegations actually refer to the Federal Water Pollution Control Act. The relevant legislation is currently referred to as the Clean Water Act.

3. Because the complaint was dismissed for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), for the purposes of this appeal we must assume the truth of the complaint's factual allegations. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The allegations relating to the EPA are reproduced as an appendix to this opinion.

Scott also sued the City of Hammond and the Hammond-Munster Sanitary District based on

theories of Illinois and federal common law of nuisance. The claims against the Indiana parties are not before us. *See Illinois v. City of Milwaukee*, 731 F.2d 403 (7th Cir.1984) *on remand from Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). *Cf. Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

4. TMDL's are explained in Part III of this opinion.

5. A "water quality standard" is a pollution standard which is based on the resulting quality or condition of the body of water involved (such as Lake Michigan), as contrasted with an "effluent limitation," compliance with which is measured only by the amount of discharge of a pollutant into the body of water. A water quality standard prescribes the maximum amount of pollutants which should be present in a sample of water from the body of water involved, while an effluent limitation regulates the amount of pollutant which may be legally discharged into the body of water.

hance[s] the quality of water and serve[s] the purposes of [the] Act." CWA § 303(c)(2), 33 U.S.C. § 1313(c)(2). If the Administrator determines that the state-submitted standard meets the requirements of the Act, he or she approves it and it becomes the state standards. If, however, the Administrator determines that the state standard is inconsistent with the Act, he or she must disapprove the standard and specify the changes necessary for compliance.[6] If a state does not make these specified changes, the Administrator is to issue a substitute standard. CWA § 303(c)(3), 33 U.S.C. § 1313(c)(3).

Water quality standards are not themselves directly enforced by the EPA. Rather, permits prescribing conditions are issued for individual sources of pollutants. CWA § 402, 33 U.S.C. § 1342. If the conditions of a permit are violated, the EPA may issue a compliance order or bring a civil action against the violator. CWA § 309, 33 U.S.C. § 1319.[7] As noted, Scott's complaint charges that CWA § 303, 33 U.S.C. § 1313, imposes upon the defendants a nondiscretionary duty "to ensure that water quality standards adopted under the federal Act protect the public health and welfare." Complaint ¶ 27(a). This duty has been violated, it is alleged, by the EPA's approval of an inadequate standard for bacteria and by the EPA's failure to require the adoption of a standard for viruses.

█ We believe, however, that the *content* of water quality standards cannot ordinarily be challenged through a citizen's suit. An administrator's duty to approve or promulgate some water quality standards might be "nondiscretionary" within the meaning of § 1365(a)(2), but the *content* of the standards is certainly at least

somewhat discretionary with the EPA.[8] The only recognized avenue for challenge to the substance of EPA's actions taken with respect to state submissions is a suit for judicial review under the Administrative Procedure Act (the "APA"). *United States Steel Corp. v. Train*, 556 F.2d 822, 836–37 (7th Cir.1977). Apparently recognizing this defect in his original mode of attack, Scott has on appeal abandoned his "nondiscretionary duty" theory and argues instead that his complaint "seeks judicial review of EPA's response to Illinois' and Indiana's water quality standard submittals." Brief for Appellant at 23.

█ While acknowledging the liberal rules of notice pleading in the federal courts, the defendants argue that we should not construe Scott's complaint as one for APA review of the EPA's approval of the state-submitted standards. The allegations against the EPA, which are at issue, are contained in Count III. That count is entitled "failure to perform nondiscretionary acts under the FWPCA [the Federal Water Pollution Control Act]." The defendants point out that every one of the allegations in Count III refer to failures to perform nondiscretionary acts. The only suggestion of a claim under the APA is a reference to the "Court's power under the Administrative Procedure Act to compel agency action unlawfully withheld." Complaint ¶ 30.

We agree with the defendants and with the district court that this complaint is insufficient to state a claim for judicial review of agency action. A complaint seeking judicial review would allege, for example, that some agency action was arbitrary, capricious or an abuse of discretion or that a factual finding by an agency was errone-

---

6. The water quality standards include a designation of the uses of a waterway. Lake Michigan is designated for use as a source of drinking water and for recreation, which includes swimming.

7. Timely adoption by states of water quality standards is enforced by withholding of grant funds. *See* Municipal Wastewater Treatment Construction Grant Amendments of 1981,

Pub.L. 97–117 § 24, 95 Stat. 1632, 33 U.S.C. § 1313a.

8. A proper citizen's suit, for example, might arise in a situation in which a citizen seeks to compel the EPA to promulgate a substitute standard after the EPA has disapproved a state standard and the state has refused to act. CWA § 303(c)(3), 33 U.S.C. § 1313(c)(3).

ous or not supported by substantial evidence. *See* APA, 5 U.S.C. § 706(2). The complaint before us does not inform the court or the parties as to what agency action is to be reviewed. We are not told whether a legal or factual error has been made or whether Scott seeks substantial evidence review or perhaps a trial de novo in the district court. The complaint is drafted as a citizen's suit to require performance of a nondiscretionary duty; such a suit cannot be employed to challenge the substance or content of an agency action. *See United States Steel Corp. v. Train,* 556 F.2d at 836–37.[9]

### III. TMDL's

The complaint also alleges that the EPA has unlawfully failed to promulgate TMDL's for discharges of pollutants into Lake Michigan. This allegation is of the kind, we believe, for which the citizen's suit was designed.

A TMDL establishes a maximum daily discharge of pollutants into a waterway. A TMDL must be obeyed even if a monthly allowable average could be achieved in the face of some daily discharges above the TMDL. The process of promulgating TMDL's also involves federal-state cooperation. CWA § 303(d)(1), 33 U.S.C. § 1313(d)(1), requires each state to develop TMDL's for those waters within its boundaries where water quality standards will not be achieved by application of technology-based limitations. CWA § 303(d) required Illinois and Indiana to submit TMDL's within 180 days of December 28, 1978.[10] *See,* CWA § 304(a)(2)(D), 33 U.S.C. § 1314(a)(2)(D). After receiving a state

submission, the following statutory scheme becomes operative:

> The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). The district court agreed with the EPA that the EPA is not required to act unless and until the state submits a proposed TMDL.

 We disagree with the conclusion of the district court. We believe that, if a state fails over a long period of time to submit proposed TMDL's, this prolonged failure may amount to the "constructive submission" by that state of no TMDL's. Our view of the case is quite simple, and tracks the statutory scheme set up by Congress. The EPA, in 1978, took the first step by identifying the pollutants for which TMDL's were "suitable." CWA § 304(a)(2)(D), 33 U.S.C. § 1314(a)(2)(D). The states were then required, within 180 days, to promulgate TMDL's for those wa-

---

**9.** At oral argument, the parties appeared uncertain over whether there were timeliness problems if Scott's complaint were construed as one seeking judicial review. Further, we understand that the water quality standards at issue will soon undergo a statutorily required periodic review. Scott's remedy, in this situation, seems to be to participate in the review process, and if he is not satisfied with the outcome, he may want to seek judicial review at that time.

**10.** The statute requires states to submit proposed TMDL's within 180 days of the EPA's identification of pollutants to which TMDL's

apply. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). The EPA's identifications of pollutants to which TMDL's apply were required by law to have been made by October 18, 1973, one year after the passage of the Federal Water Pollution Control Act Amendments of 1972. CWA § 304(a)(2)(D), 33 U.S.C. § 1314(a)(2)(D). EPA finally made the necessary identifications on December 28, 1978, apparently under court order. *See* Brief for Appellant at 24. Thus, state submissions were due on June 26, 1979. The states involved here (Illinois and Indiana) have not as yet submitted proposed TMDL's.

ters defined in the statute. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). The allegation of the complaint that no TMDL's are in place, coupled with the EPA's admission that the states have not made their submissions, raises the possibility that the states have determined that TMDL's for Lake Michigan are unnecessary. If the district court agrees with our analysis that in this case the delay by the states may amount to the "constructive submission" of no TMDL's, then the EPA would be under a duty to either approve or disapprove the "submission." [11] If the EPA approves, as Part II of this opinion clearly indicates, the next step for a dissatisfied party would be to seek judicial review of the EPA's action. If the EPA disapproves, it then presumably would be under a mandatory duty to issue its own TMDL's.

None of the EPA's arguments against the existence of this statutory duty are compelling. The EPA claims that Congress did not intend that the EPA establish TMDL's if the states chose not to act. We think it unlikely that an important aspect of the federal scheme of water pollution control could be frustrated by the refusal of states to act. This is especially true in light of the short time limits both on a state's action, and on the EPA's required reaction to the state submissions, with respect to promulgation of TMDL's. Based on its consideration of the importance of water pollution control, the Supreme Court has rejected an argument similar to the one EPA makes here respecting the states' role in pollution control. *E.I. Du Pont De Nemours & Co. v. Train,* 430 U.S. 112, 133–34 & n. 24, 97 S.Ct. 965, 977–78 & n. 24, 51 L.Ed.2d 204 (1977). The Court, in construing the CWA to grant the EPA broad power, wrote, "We do not believe that Congress would have failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals." *Id.* Similarly, we do not believe that Congress intended that the states by inaction could prevent the implementation of TMDL's.[12]

■ The EPA also makes a statutory construction argument with respect to the CWA. The EPA points out that in several instances in the CWA the statute explicitly requires the "EPA [to] intercede in the absence of state action." Brief for Appellees at 20. *E.g.* CWA § 303(b)(1), 33 U.S.C. § 1313(b)(1) (EPA must set water quality standards when state fails to act). Thus, we are urged to find, by negative implication, a Congressional intent here to rely exclusively on the states to set the TMDL machinery in motion because there is no explicit CWA requirement on the EPA to act in the absence of state action. But we do not find this argument persuasive on the facts before us since we think the states' inaction here, in view of the short statutory deadlines, may have ripened into

---

**11.** We leave it to the district court to determine whether it is in fact the case that the states have determined not to submit TMDL proposals. At this stage of the litigation, with only the complaint before us, the record is bereft of any reasons for the states' failure to act. There may be reasons, wholly unknown to us at this time, which may justify the states' failure to submit TMDL's and the EPA's concomitant failure to act. However, on remand, the district court may order the EPA to proceed as if the states had submitted proposals of no TMDL's unless the EPA promptly comes forward with persuasive evidence indicating that the states are, or will soon be, in the process of submitting TMDL proposals or that some factor beyond the scope of the complaint has made TMDL submissions impracticable. We determine only that the complaint raises the possibility that the EPA has failed to perform the nondiscretionary act of approving or disapproving state submissions.

**12.** In *E.I. Du Pont De Nemours v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) the Supreme Court determined that the EPA had broad power to regulate discharges through "regulations establishing effluent limitations for classes of plants." *Id.* at 124, 97 S.Ct. at 973. "'We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.'" *Id.* at 132, 97 S.Ct. at 977 (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 777, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312 (1968). The Supreme Court also rejected "the argument that [its] view of the [CWA] violates the congressional intent to leave the States a major role in controlling water pollution." *E.I. Du Pont De Nemours v. Train,* 430 U.S. at 134 n. 24, 97 S.Ct. at 977 n. 24.

a refusal to act. A refusal to act would amount to a determination that no TMDL is necessary and none should be provided. In effect, we may have a "constructive submission" of no TMDL's. As a matter of law, under CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2), a state determination to set no TMDL's must be reviewed by the EPA, and the EPA is then required to approve or disapprove the submission. If EPA disapproves, it must set its own TMDL's. *Id.* If the district court determines that the states have made a "constructive submission" of no TMDL's, the failure of the EPA to act would amount to failure to perform a nondiscretionary duty and is properly raised by this complaint.

■ In addition, we think that the CWA should be liberally construed to achieve its objectives—in this case to impose a duty on the EPA to establish TMDL's when the states have defaulted by refusal to act over a long period. *See E.I. Du Pont De Nemours & Co. v. Train,* 430 U.S. at 134, 97 S.Ct. at 978; *Natural Resources Defense Council, Inc. v. Costle,* 564 F.2d 573, 577–78 (D.C.Cir.1977). We cannot allow the states' refusal to act to defeat the intent of Congress that TMDL's be established promptly—in accordance with the timetable provided in the statute. In addition, to construe the relevant statute as the EPA urges would apparently render it wholly ineffective. There is, of course, a strong presumption against such a construction.

*Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 295 (D.C.Cir.1981) is not to the contrary. That case merely holds that the EPA has no duty to act *before* the deadline for state submission of proposed TMDL's. That holding has no application here, where the EPA has failed to act years after the state deadline for submissions has passed. The statute undoubtedly imposes mandatory duties on both the states and the EPA. *See* 2 K.C. Davis, Administrative Law Treatise § 9:5 at 235 (2d ed. 1979). If the district court is persuaded that the states have determined not to act, the EPA cannot rely on the states' default to excuse a default of its own.

■ We believe that more than enough time has passed since Congress prescribed promulgation of TMDL's. The statutory time limits demonstrate that Congress anticipated that the entire process would take a relatively short time after the passage of the 1972 amendments.[13] The EPA's inaction appears to be tantamount to approval of state decisions that TMDL's are unneeded. State inaction amounting to a refusal to act should not stand in the way of successfully achieving the goals of federal anti-pollution policy. Thus, the dismissal of the TMDL claim was erroneous.

### IV.

Therefore, the judgment of the district court is affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion.

### APPENDIX

Count III—failure to perform nondiscretionary acts under the FWPCA

———

1–26. Plaintiff realleges and incorporates paragraphs 1–26 of Count I as paragraphs 1–26 of this Count III.

27. The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*

---

13. The House Conference Report indicates that the TMDL proposal originated in the House as part of the Federal Water Pollution Control Act Amendment of 1972. *See* H.R. Conference Rep. No. 1465, 92d Cong., 2d Sess. 122 (1972). The original House Report on the 1972 legislation expresses the states' obligation to submit TMDL's as a mandatory duty. *See* H.R.Rep. No. 911, 92d Cong., 2d Sess. 106 (1972). ("The State shall establish ... the total maximum daily load.") The problem of state nonfeasance in submitting proposed TMDL's is not contemplated in the House Report. However, the Senate Report on the same legislation identified states' failures to fulfill their responsibilities under the existing legislation as a major problem which the Senate hoped to overcome by passing the 1972 amendments. *See* S.Rep. No. 414, 92d Cong., 1st Sess. 1–10, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3669–3677. Thus, we are confident that Congress did not intend for state inaction to preclude adoption of TMDL's.

("FWPCA"), imposes a series of nondiscretionary duties on the defendants EPA and Costle to protect water quality and to ensure that high quality waters such as Lake Michigan are safe for recreational and drinking water purposes:

a. under § 303 of that Act defendants Costle and EPA are under a nondiscretionary duty to ensure that water quality standards adopted under the federal Act "protect the public health and welfare."

b. under § 303(d) of the Act, defendants Costle and EPA have a nondiscretionary duty to ensure that the total daily discharge load of pollutants such as fecal pathogens (disease causing organisms) is restricted to such a low level that achievement of a water quality standard which protects the public health and welfare is assured.

28. Defendants Costle and EPA have failed to meet either of these duties. While the declared beneficial use for waters in Lake Michigan is swimming, defendants Costle and EPA have failed to require the adoption of water quality criteria necessary to protect the designated beneficial uses. This failure includes:

a. Defendants Costle and EPA have failed to require the adoption of water quality criteria under § 303 for viruses even though the presence of enteric (i.e. fecal tract) viruses is hazardous to human health.

b. Defendants Costle and EPA have failed to require the adoption under § 303 of a criterion for indicator organisms for pathogenic bacteria which protects against exceedingly dangerous short term levels of pathogenic bacteria such as have occurred at Chicago beaches in August 1980. The currently mandated EPA criterion for an indicator of pathogenic bacteria is based on a "geometric" 30-day average. The use of a 30-day geometric mean falsely masks high levels of bacteria which are only present for a period of one or two days, and allows daily levels of several thousand times the 30-day standard without violating the 30-day geometric mean.

29. After defendants Costle and EPA perform their nondiscretionary duty to require the adoption of water quality standards protecting the public health, they must insure under § 303(d) of the Federal Water Pollution Control Act that the loads of fecal pathogens being discharged to Lake Michigan are restricted to such a low level that achievement of the water quality standard (protection of the public health) is insured. Defendants Costle and EPA have failed to set a proper total maximum daily load, as is shown by the frequent and repeated closing of Illinois beaches caused by dangerously high bacteria counts.

30. Plaintiff seeks an order compelling defendants Costle and EPA to perform their nondiscretionary duties under the Federal Water Pollution Control Act. Plaintiff has previously served the statutorily required notice on these defendants. By failing to perform non-discretionary duties under the Federal Water Pollution Control Act, defendants EPA and Costle have breached a duty owed to plaintiff and members of the plaintiff class for which a remedy is available under 33 U.S.C. § 1365(a)(2), and under this Court's power under the Administrative Procedure Act to compel agency action unlawfully withheld. 5 U.S.C. § 706.

WHEREFORE, plaintiff prays that this Court:

A. Issue an order requiring defendants Costle and EPA to:

(1) promulgate a water quality standard for viruses which will ensure the protection of public health and welfare;

(2) promulgate a water quality standard for bacteria which will ensure the protection of public health and welfare;

(3) adopt a total maximum daily load for all discharges of viruses and bacteria into Lake Michigan which will ensure the attainment of the water quality criteria for viruses and bacteria.

B. Grant such further relief as may be appropriate.