**SIERRA CLUB, NORTH STAR CHAPTER, Izaak Walton League of America, Inc., Minnesota Division; St. Paul Audubon Society, and Project Environment Foundation, Plaintiffs,**

v.

**Carol M. BROWNER, as Administrator of the United States Environmental Protection Agency, Defendant.**

Civ. No. 4–92–970.

United States District Court, D. Minnesota, Fourth Division.

Dec. 13, 1993.

Richard A. Duncan, Brian Boru O'Neill, Michael A. Ponto, Faegre & Benson, Minneapolis, MN, Richard B. Bates, Bates Law Office, St. Paul, MN, for plaintiffs Sierra Club, Izaak Walton League of America, Inc., St. Paul Audubon Soc. and Project Environment Foundation.

Friedrich Anson Paul Siekert, Asst. U.S. Atty., U.S. Atty. Office, Minneapolis, MN, Robin L. Juni, Roland Dubois, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, Janice S. Loughlin, Chicago, IL, for defendant Carol M. Browner, as Adm'r of U.S. E.P.A.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, Chief Judge.

Plaintiffs Sierra Club, North Star Chapter, Izaak Walton League of America, Inc., Minnesota Division, St. Paul Audubon Society and Project Environment Foundation (collectively the Sierra Club Group) sued Carol M. Browner, as Administrator of the United States Environmental Protection Agency (EPA) to compel her to comply with her duties under the Clean Water Act (the Act), 33 U.S.C. §§ 1251–1387. Plaintiffs seek declarations that the Administrator has violated the Act and the Administrative Procedure Act (APA) and injunctive relief.[1] Plaintiffs and defendants now move for summary judgment.

### I.

Congress passed the Act to restore "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the Act, pollution sources are divided into two categories: point sources and nonpoint sources. A point source is "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged". 33 U.S.C. § 1362(14). Nonpoint sources are any other source of pollution, such as agricultural runoff.

No pollution may be released from a point source unless it satisfies requirements provided in the Act. 33 U.S.C. § 1311. Those requirements include the National Pollutant Discharge Elimination System (NPDES) permit process which sets quantitative limits

---

1. The complaint has four counts: 1) that the EPA arbitrarily and capriciously approved Minnesota's June 24, 1992 list of water quality limited segments; 2) that the EPA failed to perform a mandatory duty under § 303(d) of the CWA to develop a list of water quality limited segments in Minnesota and total maximum daily loads for those waters, 3) that EPA acted arbitrarily and capriciously in failing to perform the activities described in Count II; and 4) that the EPA unlawfully withheld or unreasonably delayed agency action in failing to perform the activities described in Count II.

on the amount of pollutants released from each point source. 33 U.S.C. § 1342. The Act leaves regulation of nonpoint pollution to the states.

The Act also provides a water quality based approach to achieving its goals. Section 303(a) of the Act requires each state to adopt water quality standards for its waters. The states must identify the uses of the waters and the amount of pollution that would impair the uses. 33 U.S.C. § 1313(a)–(c). After developing water quality standards, the state must identify waters which would not be able to meet the water quality standards even after other Act pollution controls, such as the NPDES permit process, are implemented. Such waters are water quality limited segments (WQLSs). 33 U.S.C. § 1313(d).

After the WQLSs are identified, the state must give them a priority ranking based on the severity of pollution and the uses of the waters. 33 U.S.C. § 1313(d). The state must then develop, in accordance with the priority ranking, a total maximum daily load (TMDL) for pollutants identified by the EPA for each WQLS. A TMDL sets the maximum amount of a pollutant which may be released from point and nonpoint sources without violating water quality standards. 33 U.S.C. § 1313(d)(1)(C). A TMDL includes the best estimates of pollution from nonpoint sources or natural background sources (load allocations), the amount of pollution from specific point sources (wasteload allocations), and a margin of safety. 40 C.F.R. § 130.3(i).

The states must submit lists of WQLSs and TMDLs to the EPA for review. 33 U.S.C. § 1313(d)(2). The EPA must either approve or disapprove each list within 30 days of its submission. 33 U.S.C. § 1313(d)(2). If the lists are approved, then they are added to the state planning process, but the EPA must develop the lists if it disapproves the state's submissions. 33 U.S.C. § 1313(d)(2).

The EPA was required to identify which pollutants require TMDL's by October 18, 1973, and states were required to submit their WQLS list 180 days from this date. 33 U.S.C. § 1314(a)(2)(D). The EPA did not publish its pollutant list until December 28, 1978, however, and the due date for WQLS lists became June 26, 1979. The regulations initially required that the list be revised from time to time, 40 C.F.R. § 130.7(d), but revisions are now due on April 1 of every even numbered year. 40 C.F.R. § 130.7(d). On August 24, 1992, new regulations required states to submit a 303(d) list by October 22, 1992. 40 C.F.R. § 130.7(d).

The 1987 Water Quality Management Plan prepared by the Minnesota Pollution Control Agency (MPCA) included a list of five river segments requiring TMDLs. The report states that the MPCA has established TMDLs for the Minnesota River and that the same process will be used to establish other TMDLs.

In an April 1, 1992 letter to the EPA, MPCA submitted a list of WQLSs to the EPA which included 7 river reaches and scheduled end dates for TMDLs ranging from June 1993 to December 2002. The letter noted that the schedules were:

> dependent upon the occurrence of reasonably low flow conditions during the respective summer sampling periods and the availability of adequate human and financial resources within the Assessment and Planning Section. It is our intention to add additional problem areas to the list as resources become available to deal with them. However the above schedule stretches out ten years which is the usual horizon for most long range planning efforts so adding more problem areas at this time seems pointless.

In a June 24, 1992 letter, MPCA submitted a new list to the EPA which included an additional WQLS and provided more detail about when TMDLs for the listed WQLSs would be completed. That letter stated:

> Our latest 305(b) report identifies other waters of the state which are not meeting one or more water quality standards. We include these by reference on our 303(d) list but consider them to be of a lower priority than the above listed waters. Problems in these waters will be addressed as circumstances permit.

The 303(b) report referred to in the June 1992 letter is the 1992 Minnesota Water Quality Report to Congress which is required under Section 305(b). According to that report, MPCA had assessed 4,634 miles of the total 91,944 total river miles and 1,753 of Minnesota's 11,842 significant lakes.

The appendix to the 1992 Report lists approximately 1116 waters which do not meet one or more water quality standards. The Sierra Club Group suggests that each of the 1116 waters are WQLSs. The EPA responds that at least some of the 1116 waters are those not meeting water quality standards because a point source is not meeting its permit requirements and that these waters are not WQLSs because the effluent limitations required by other sections of the Act might be stringent enough to implement water quality standards. 33 U.S.C. § 1313(d)(1)(A).

The EPA approved the revised list on July 22, 1992. On December 2, 1992, however, the EPA wrote to the MPCA explaining that the approval was invalid because of a misunderstanding at EPA headquarters. This letter also advised the MPCA to solicit public comment before resubmitting the list. The MPCA did not follow this advice and informally submitted a revised list on February 23, 1993. This list was never formally submitted, however, and the MPCA published it on April 19, 1993 to obtain public comment.

On July 6, 1993, the MPCA formally submitted its list. In an August 9, 1993 letter the EPA partially disapproved the list because the list:

> does not include all water quality limited waterbodies requiring a TMDL, as evidenced by the 1000 plus impaired waterbodies documented in the State's Section 305(b) Report to Congress. . . . a complete Section 303(d) list submittal for Minnesota should include both waters which are water quality limited due to point sources and those which are water quality limited due to nonpoint sources.

In an August 12, 1993 letter to the court, counsel for the EPA states, "In accord with the Clean Water Act, we will develop a Section 303(d) list for the State of Minnesota within 30 days of this partial disapproval and, promptly thereafter, will publish that list for public comment." In a December 1, 1993 letter to the court, counsel for the EPA submitted its proposed Section 303(d) list which will be published in the *Federal Register*. The list identifies 447 WQLSs and prioritizes them for development of TMDLs.

The EPA states that it has approved 43 TMDLs submitted by the MPCA, but plaintiffs assert that they were not valid TMDLs. The EPA notes that the MPCA has been working on a complex TMDL for the Minnesota River for a 330 mile stretch of the river. In 1989 MPCA developed the Minnesota River Assessment Project to collect and to evaluate information to implement the TMDL for the Minnesota River. The Minnesota TMDL was scheduled for completion in July of 1993.

MPCA is also engaged in other activities which increase water quality, such as the issue of permits, development of nonpoint management, and publication of 20 water quality reports. The Sierra Club Group notes that some of these reports were published before the Administrator identified pollutants requiring TMDLs and at least one acknowledged that nonpoint source pollution was not considered.

The Sierra Club Group offers a letter from MPCA to the EPA which states that MPCA has removed WQLSs which are affected by nonpoint source pollution and another suggesting that MPCA refuses to hire or assign personnel to identify WQLSs and to establish TMDLs. In a more recent letter from the MPCA to counsel for plaintiffs, MPCA states that it intends to comply with Section 303(d), that it may place the removed WQLSs back on the list, and that it has not refused to assign personnel.

## II.

Summary judgment is appropriate if the materials presented "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties agree that there are no issues of material fact and that this case is appropriate for resolution by summary judgment. De-

fendant asserts that plaintiffs do not have standing, and both sides differ on the merits.

## A.

To establish standing, plaintiffs must demonstrate that they suffered an injury in fact, that the injury is fairly traceable to the defendant's actions, and that the injury would be likely to be redressed if the requested relief were granted. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Plaintiffs bear the burden of proof on standing and must provide specific evidence supporting each of the required elements to survive a motion for summary judgment. *Id.* at ——, 112 S.Ct. at 2136–37. "When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." *Id.* at ——, 112 S.Ct. at 2136 (quoting *Allen v. Wright,* 468 U.S. 737, 758, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984)).

Plaintiffs claim that they are injured because the Minnesota waters they regularly use for recreational activities do not meet water quality standards. The desire to use waters for recreational activities is a cognizable interest, but the injury in fact test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Plaintiffs must therefore show that one or more of their members is directly affected by the pollution. *Defenders of Wildlife* —— U.S. at ——, 112 S.Ct. at 2138.

Seven members of the plaintiff groups have presented affidavits which establish that they regularly use waters throughout Minnesota for recreation, but that their enjoyment of these activities is limited by pollution in the waters which should be regulated by Section 303(d). For example, Michael D. Madigan states that he frequently fishes or canoes on the following waters: the Minnesota and Mississippi Rivers in the Twin Cities area; the St. Louis River south of Cloquet; the Kettle River; the Cannon and St. Croix Rivers; the Whitewater and Root Rivers; Beaver Creek; Mille Lacs, Pokegama, and Detroit Lakes; Lake Minnetonka, Lake Calhoun, Lake Harriet, Lake Como, Lake Phalen, White Bear Lake, Maple Lake, and Gun Club Lake; and several rivers along the north shore of Lake Superior. He states that he has visited all of the waters in the past seven years and that he intends to return to most of them within the next several years. After detailing some of the pollution he has observed, he states that his "ability to enjoy fishing and canoeing on Minnesota's water, along with [his] aesthetic enjoyment of these resources, are lessened by these water quality problems and [his] concern about them." Madigan Affidavit, ¶ 12. The affidavits present adequate evidence of an injury in fact.[2]

The Administrator does not appear to dispute that plaintiffs have demonstrated an injury in fact for waters identified in the affidavits of seven members, but she argues that plaintiffs have not produced evidence of an injury in fact for waters not identified in the affidavits. She relies on *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), and *Conservation Law Found. v. Reilly,* 950 F.2d 38, 41 (1st Cir.1991). Plaintiffs respond that the Administrator's argument is inconsistent with Section 303(d). According to plaintiffs, Section 303(d) could never be enforced if environmental groups could only sue to enforce the Administrator's duties to develop TMDLs for identified state waters. They assert that the Section 303(d) process is statewide and programmatic and should not be limited to identified waters. They contend that *National Wildlife Fed'n.* and *Conservation Law Found.* are factually distinguishable from this case.

---

2. The EPA argues that the plaintiffs have shown only a generalized harm, but the fact that plaintiffs suffer a common harm does not transform their injury into a generalized harm. *Center for Auto Safety v. N.H.T.S.A.,* 793 F.2d 1322, 1335 (D.C.Cir.1986). "[T]he fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

Despite the Administrator's assertion that *National Wildlife Fed'n* is very similar to this case, the cases are quite different. In *National Wildlife Fed'n,* plaintiffs alleged that defendants, the United States Department of the Interior, the Secretary of the Interior, and the Director of the Bureau of Land Management, had violated the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.,* the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.,* and Section 10(e) of the Administrative Procedures Act, 5 U.S.C. § 706, in the course of administering the Bureau of Land Management's land withdrawal review program.[3] The "land withdrawal review program" was a term developed by plaintiffs to cover many individual actions referred to in the complaint.

Plaintiff, the National Wildlife Federation, relied on Sections 702 of the Administrative Procedures Act which requires that plaintiffs identify a final agency action to obtain judicial review of an administrative action. *Id.* at 881–82, 110 S.Ct. at 3185. The Court held that the National Wildlife Federation did not have standing under Section 702 of the Administrative Procedures Act to challenge the land withdrawal review program because the actions objected to were not a final agency action. *Id.* at 889–90, 110 S.Ct. at 3189.

> [I]t is at least entirely certain that the flaws in the entire program—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.

*Id.* at 892–93, 110 S.Ct. at 3190–91.

This case does not present an issue of whether there has been a final agency action reviewable under the APA. The Sierra Club Group is seeking to enforce a discrete provision of a statute, not a vague program encompassing a wide variety of administrative actions, and *National Wildlife Fed'n* is therefore not applicable. Moreover, plaintiffs are suing under the citizen suit provision of the Act, as well as under the APA:

> [A]ny citizen may commence a civil action on his own behalf ... (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

33 U.S.C. § 1365(a)(2). The Act's citizen suit provision does not require any final agency action as a prerequisite to judicial review.

*Conservation Law Found.* is also distinguishable. In that case two New England environmental groups sued the Administrator of the EPA for:

> his failure to assess and evaluate the hazardous waste problems in each of approximately 840 federal waste sites, scattered throughout the country, as allegedly required under section 120(d) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9620.

*Conservation Law Foundation* at 39. Plaintiffs sought national injunctive relief. *Id.* at 43. The injury alleged by plaintiffs was "the increased threat to public health and natural resources from exposure to contaminants from the unevaluated facilities." *Id.* at 41. The First Circuit held that "because plaintiffs have ties to only a few federal facilities, they have failed to carry their burden of showing injury-in-fact sufficient to grant them standing to obtain nationwide injunctive relief." *Id.*

Members of the plaintiff organizations in this case are Minnesota residents who have sworn that they use a large number of waters throughout Minnesota. Unlike the plaintiffs in *Conservation Law Found.,* they have a personal stake in the quality of waters throughout the state. They have shown an injury in fact.

---

**3.** The Court initially considered whether two affidavits submitted by members of the plaintiff organization had raised genuine issues of material fact about several specific agency actions. *National Wildlife Federation,* 497 U.S. at 881–82, 110 S.Ct. at 3185. It concluded that they did not.

### B.

■ Plaintiffs argue that the pollution in Minnesota waters is fairly traceable to the Administrator's failure to implement Section 303(d). They contend that the full implementation of Section 303(d) would produce cleaner waters and enhance the enjoyment of their members to enjoy recreational activities on those waters because the TMDLs would be incorporated into Minnesota's water quality management plan.

Defendant responds that the injury suffered by plaintiffs in water affected solely by nonpoint sources is not fairly traceable to the EPA or redressable. Defendant notes that TMDLs developed for waters affected solely by nonpoint pollution would only identify nonpoint source problems for state and local authorities to address.

"The 'fairly traceable' and 'redressibility' requirements for Article III standing ensure that the injury is caused by the challenged activity and can be remedied by judicial relief." *Center for Auto Safety v. N.H.T.S.A.,* 793 F.2d 1322, 1335 (D.C.Cir.1986). The injury suffered by plaintiffs is linked to the Administrator's failure to follow Section 303(d). Section 303(d) requires the Administrator to oversee a comprehensive evaluation of each State's waters and development of TMDLs to improve water quality in WQLSs. Even water affected solely by nonpoint source pollution would be improved if TMDLs were developed and integrated into Minnesota's water quality program. Plaintiffs have therefore established that their injury is fairly traceable to the Administrator and that it is redressible.

### C.

■ In a footnote, the Administrator argues that plaintiffs' claim in this court that she has not satisfied her obligations under Section 303(d) is not ripe because administrative review is not yet complete. She relies on the following statement in *Eastman Kodak v. Mossinghoff,* 704 F.2d 1319, 1322 (4th Cir.1983):

[t]he purpose of the finality requirement is to prevent the disruption of the orderly administrative process through avoidance of premature judicial intervention until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

Plaintiffs respond that the issue became ripe 30 days after the state failed to meet the June 26, 1979 statutory deadline for submitting Section 303(d) lists. They contend that their members are feeling the effects of the Administrator's failure to act. They assert that judicial intervention would not interfere with an ongoing administrative process because there is no ongoing process.

The Administrator replies that Section 303(d) requires her to act only after she disapproves a submission. According to the Administrator, a state's failure to make any submission should only be interpreted to be a constructive submission requiring EPA action when the period of inaction is lengthy. She argues that her duty could not have become mandatory within 30 days of June 26, 1979 because 30 days would not be a lengthy period of inactivity. She also asserts that such a deadline for her action would be inconsistent with the Act's creation of a dynamic process which requires TMDLs to be submitted on a priority basis from time to time. 33 U.S.C. § 1313(d)(1)(C) and (d)(2).

The Administrator has not shown that the EPA's ongoing administrative process would be disrupted by judicial review of its decision not to develop WQLS and TMDL lists for Minnesota. The effects of the Administrator's decision not to develop TMDL lists is being felt in a concrete way by members of the plaintiff groups and the dispute is ripe for decision.

### III.

■ Plaintiffs contend that the Administrator has ignored its mandatory duty under Section 303(d) to develop TMDLs following thirteen years of inaction by Minnesota. They argue that Minnesota has created only a handful of TMDLs which ignore nonpoint pollution. They contend that actions taken by Minnesota to satisfy other provisions of the Act are irrelevant to whether Section 303(d) has been satisfied.

The Administrator responds that she has satisfied her limited duty of overseeing state

work on TMDL development. She argues that the EPA has no duty to develop TMDLs because Minnesota has submitted several 303(d) lists identifying a number of WQLSs and 43 TMDLs.

Section 303(d) states:

The Administrator shall either approve or disapprove [the TMDL and WQLS lists] not later than 30 days after the date of submission. If the Administrator disapproves [the TMDL and WQLS lists], he shall not later than 30 days after the date of such disapproval identify such waters in such state and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters.

The plain language of Section 303(d) requires the Administrator to act after determining that a state's TMDL submission is inadequate.

■ Two courts have held that the Administrator is also required to act under Section 303(d) if a state does not submit any TMDL list over a prolonged period of time. *Scott v. City of Hammond, Ind.,* 741 F.2d 992, 996 (7th Cir.1984); *Alaska Center for the Env't v. Reilly,* 762 F.Supp. 1422, 1429 (W.D.Wash.1991). The Administrator must then treat the state's inaction as a constructive submission of no TMDLs and approve or disapprove the submission. *Scott* at 996. If the submission were disapproved, the Administrator "presumably would be under a mandatory duty to issue its own TMDL's". *Id.* at 997.

The Administrator argues that the EPA should have discretion to determine when a

state's lack of action becomes a constructive submission. She argues that the EPA is uniquely situated to evaluate the overall efforts of Minnesota in using myriad approaches to attaining the goals of the Act. Plaintiffs respond that deference to agency expertise is unnecessary and inappropriate because this action involves straightforward application of a statute.

If "Congress has directly spoken to the precise question at issue ... the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Nat'l Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

■ Although Section 303(d) does not explicitly address when a state's inaction becomes a constructive submission requiring EPA action, it clearly places a mandatory duty on the EPA to develop TMDL lists if the state's lists are inadequate. The Act would be ineffective if a state's refusal to act would not trigger any EPA action. *ACE* at 1428; *Scott* at 997. A state's failure to develop adequate TMDLs should not thwart Congress' purposes in drafting Section 303(d). The Administrator's duty to act following prolonged state inaction is therefore mandatory, not discretionary.[4]

---

4. The Administrator asserts that the court should refrain from ruling on the issues based on primary jurisdiction. Primary jurisdiction does not lie in federal court where "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). The purposes of the doctrine are "the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions" and "the expert and specialized knowledge of the agencies involved." *Id.* at 64, 77 S.Ct. at 165. The doctrine should be applied only if its purposes would be advanced. *Id.*

The question in this case is whether the Administrator is fulfilling her duties under Section 303(d). The Administrator has special competence in the area of environmental issues, but the Act allows citizens to sue to enforce non-discretionary duties of the Administrator. Whether the Administrator has satisfied her duties under the Act is not the type of issue that would advance uniformity if first decided by the Administrator. Moreover, the question of whether the Administrator has fulfilled her duties under the Act does not raise facts "not within the conventional experience of judges." *Far East Conference v. United States,* 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). Abstention based on primary jurisdiction is not appropriate.

In *Scott,* there were no TMDLs in place for the challenged states, and the Administrator admitted that the states had not made any submissions. *Scott* at 997. The Seventh Circuit ruled that the district court had to determine whether the states had decided not to submit TMDL proposals. *Scott* at 997, f.n. 11. There might be reasons to justify inaction by the state and the EPA, but the district court could order

> the EPA to proceed as if the states had submitted proposals of no TMDL's unless the EPA promptly comes forward with persuasive evidence indicating that the states are or will soon be, in the process of submitting TMDL proposals or that some factor beyond the scope of the complaint has made TMDL submissions impracticable.

*Id.*

In *ACE,* Alaska's 1988 Water Quality Report to Congress identified several hundred waterbodies as impaired or threatened by water pollution, but only one segment had been identified as a WQLS, and the EPA had never acted on that submission. *Ace* at 1425. While the *ACE* suit was pending, Alaska submitted a revised list of 48 WQLSs to the EPA. *Id.* No TMDLs had been attempted. *Id.*

Unlike the states in *ACE* and *Scott,* Minnesota has submitted several lists of WQLSs. The EPA disapproved the most recent submission because it did not adequately reflect the number of water bodies that are below water quality standards. The EPA has developed its own list of WQLSs which will be published in the *Federal Register* during the first two weeks of December. On this record, it would be inappropriate to find that the State has made a constructive submission of a WQLS list requiring the Administrator's action.

In addition, the EPA has approved the development of TMDLs for the Minnesota River. The Minnesota River Assessment Project has addressed both point and non-point sources of pollution for the 330 miles of the river identified as a WQLS. Full implementation of the Minnesota River Assessment Project was scheduled for July of 1993. Minnesota's work on TMDLs for the Minnesota River distinguishes it from *Scott* and *ACE* where the states had not developed any TMDLs or even initiated the process to develop them. Minnesota is also working on TMDLs for five other WQLSs with scheduled end dates from December 1994 to December 2002, and the EPA approved schedules for two more TMDLs on August 9, 1993.

Moreover, the EPA has approved 43 TMDL/Wasteload allocations (TMDL/WLAs) submitted by MPCA. The Sierra Club Group argues that these TMDLs are not valid because they do not consider nonpoint source pollution and are the result of studies completed pursuant to a MPCA–EPA agreement for the development and approval of wasteload allocations. The EPA responds that even if the TMDL/WLAs address only point source pollution, they might still be valid TMDLs under Section 303(d). According to the EPA, TMDLs are based on conditions where the water quality standards are not being met. Nonpoint sources normally have a greater effect on water quality during high flow conditions, but point sources have a greater effect on water quality during low flow conditions. The EPA asserts that the TMDL/WLAs may simply be based on low flow conditions.

The Act requires that each state establish TMDLs for its identified WQLSs in accordance with its priority ranking for the pollutants identified by the Administrator:

> Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

33 U.S.C. § 1313(d)(1)(C). The regulations promulgated by the EPA to implement the Act define a TMDL as "the sum of the individual WLAs [wasteload allocations] for point sources and LAs [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.3(i). The plain language of the regulation requires consideration of both point, nonpoint, and natural sources of pollution.

There is no evidence, however, that Minnesota did not consider nonpoint and natural sources of pollution when it developed the 43 TMDL/WLAs. The 43 TMDL/WLAs may be TMDLs based on low-flow conditions when nonpoint and background sources have relatively little impact on water quality. *Affidavit of Donald J. Brady* ¶¶ 3–6. The TMDL/WLAs should therefore be considered part of Minnesota's work to satisfy its obligations under the Act.

The EPA has disapproved Minnesota's most recent WQLS list and has developed its own which will be published in the *Federal Register* shortly. Minnesota has identified TMDLs that it believes should receive the highest priority, it has initiated work on developing those TMDLs, and has implemented some TMDLs. Although Minnesota and the EPA may not be implementing TMDLs as quickly as plaintiffs would like, the Act does not set deadlines for the development of a certain number of TMDLs. The Act instead requires the development of TMDLs "in accordance with the priority ranking" of the WQLS list. 33 U.S.C. § 1313(d)(1)(C). A finding of a constructive submission of no TMDLs would therefore be inappropriate on this record.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.  plaintiffs' motion for summary judgment is denied;

2.  defendant's motion for summary judgment is granted, and the case is dismissed.

LET JUDGMENT BE ENTERED ACCORDINGLY.