**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1430**

OHIO VALLEY ENVIRONMENTAL COALITION, INC.; SIERRA CLUB; WEST VIRGINIA HIGHLANDS CONSERVANCY, INC.; WEST VIRGINIA RIVERS COALITION,

        Plaintiffs - Appellees,

    v.

SCOTT PRUITT, Administrator, United States Environmental Protection Agency; CECIL RODRIGUES, Acting Regional Administrator, United States Environmental Protection Agency, Region III,

        Defendants - Appellants.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:15-cv-00271)

Argued:  May 8, 2018                          Decided:  June 20, 2018

Before NIEMEYER, MOTZ, and FLOYD, Circuit Judges.

Reversed by published opinion.  Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Floyd joined.

**ARGUED:** James Anthony Maysonett, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Derek Owen Teaney, APPALACHIAN MOUNTAIN ADVOCATES, INC., Lewisburg, West Virginia, for Appellees.  **ON BRIEF:** Jeffrey H. Wood, Acting Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, David J. Kaplan, Environment & Natural Resources

Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; James Curtin, Stefania Shamet, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C., for Appellants. Patrick Parenteau, Jill Witkowski Heaps, Rachel L.B. Stevens, Environmental and Natural Resources Law Clinic, VERMONT LAW SCHOOL, South Royalton, Vermont; Todd D. Ommen, Pace Environmental Litigation Clinic, ELISABETH HAUB SCHOOL OF LAW, White Plains, New York, for Amici National Wildlife Federation, Waterkeeper Alliance, Incorporated, and Riverkeeper, Inc. Joel C. Beauvais, Claudia M. O'Brien, Stijn Van Osch, LATHAM & WATKINS LLP, Washington, D.C., for Amici National Association of Clean Water Agencies, National Cattlemen's Beef Association, and National Mining Association. Douglas Crouse, Robert G. McLusky, JACKSON KELLY, PLLC, Charleston, West Virginia, for Amicus West Virginia Coal Association.

---

DIANA GRIBBON MOTZ, Circuit Judge:

Several environmental groups brought this action against the Environmental Protection Agency. They allege that EPA failed to perform its nondiscretionary duty under the Clean Water Act to promulgate pollutant limits for biologically impaired waters in West Virginia. The district court concluded that Plaintiffs have standing to bring this claim and granted summary judgment in their favor. We agree that Plaintiffs have standing, but, for the reasons that follow, we reverse the grant of summary judgment.

I.

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act instructs each state to establish "water quality standards," subject to EPA review and approval. *Id.* §§ 1313(a)–(c), 1362(3). Water quality standards consist of the "designated uses" of a state's waters and "water quality criteria" necessary to support those designated uses. *Id.* § 1313(c)(2)(A); 40 C.F.R. § 130.2(d).

When existing pollution controls are not sufficient, such that a body of water cannot support its "designated uses," a state must classify that water as impaired. 33 U.S.C. §1313(d). Section 303(d) of the Act requires a state to place its impaired waters on a list ("the 303(d) List") and to establish a priority ranking of the impaired waters, accounting for the severity of the pollution. *Id.* A state must submit its list every two years, and EPA must approve or disapprove the list. 40 C.F.R. § 130.7(d)(1). If EPA

3

disapproves a 303(d) List, then EPA itself must establish a list of waters within thirty days of disapproval. *Id.*

The Act further requires a state to develop a total maximum daily load ("TMDL") for waters on the 303(d) List in accordance with its priority ranking. *See* 33 U.S.C. §1313(d)(1)(C). A TMDL establishes the maximum daily discharge of pollutants into a water, which ultimately translates into enforceable permit limits. *See id.* A state must submit its TMDLs to EPA "from time to time." 33 U.S.C. §1313(d)(2). Once a state submits a TMDL, EPA must approve or disapprove it within thirty days. *Id.* If EPA disapproves of a TMDL, EPA must develop, submit for public comment, and finalize its own TMDL within thirty days. *Id.*

II.

West Virginia has long resisted the requirements of the Clean Water Act. In 1995, environmental groups brought suit seeking to compel EPA action because West Virginia had not submitted TMDLs for any of its impaired waters. That litigation resulted in a consent decree, pursuant to which EPA developed TMDLs for West Virginia from 1997 to 2003. During this same period, the West Virginia Department of Environmental Protection ("the State Agency") began building a TMDL program and, in 2004, it started developing TMDLs on its own. By 2009, either the State Agency or EPA had developed all of the TMDLs required under the 1995 consent decree.

4

The present litigation, which does not implicate the requirements of the 1995 consent decree, stems from a change in West Virginia's methodology for assessing biological impairment.

Under state law, West Virginia defines "biological impairment" based on narrative water quality criteria; one of these criteria prohibits "[m]aterials in concentrations which are harmful . . . to man, animal, or aquatic life." *See* W. Va. Code R. § 47-2-3.2.e. From 2002 until 2010, West Virginia used the West Virginia Stream Condition Index ("the Index") methodology to identify biologically impaired waters. For some of its 573 biologically impaired waters, West Virginia identified "ionic toxicity" as a cause of the impairment; for others, it did not identify a cause.

In 2012, the West Virginia Legislature enacted SB 562, which directs the State Agency to develop a new tool (to replace the Index) to assess the health of biological communities in the State's waters. W. Va. Code § 22-11-7b(f). The agency interpreted SB 562 to preclude the use of the existing Index for measuring biological impairment. Therefore, the agency decided to "postpone" the development of TMDLs for all of its biologically impaired waters until it developed a new methodology.

In 2014, West Virginia responded to objections from Plaintiffs and EPA by projecting specific dates for developing ionic toxicity TMDLs; these dates ranged from 2020 to 2025. But the State Agency has neither promulgated a new methodology to determine biological impairment nor has it developed any biological impairment TMDLs for these 573 waters.

5

In 2015, Plaintiffs filed this citizen suit, alleging that EPA had a nondiscretionary duty to promulgate TMDLs for these biologically impaired waters given that West Virginia had not done so and would not do so until 2020 at the earliest. In February 2017, the district court granted summary judgment to Plaintiffs on their claim under the Clean Water Act.[1] In that order, the district court applied the doctrine of "constructive submission," concluding that, since West Virginia had not submitted any TMDLs for the challenged waters, EPA had not performed its nondiscretionary duty to approve or disapprove West Virginia's "constructive submission" of no TMDLs.

After failing to obtain a stay pending appeal, EPA issued a decision in which it conditionally approved West Virginia's "constructive submission" of "no" biological impairment TMDLs. EPA conditioned its approval on West Virginia's adherence to a Memorandum of Agreement, in which West Virginia agreed to complete all of the TMDLs at issue here by June 30, 2026. EPA, however, reserved its right to withdraw its decision or revise the Memorandum of Agreement if it prevails in this appeal.

On appeal, as in the district court, EPA challenges Plaintiffs' standing and the district court's application of the "constructive submission" doctrine in this case.

---

[1] Plaintiffs also brought suit pursuant to 5 U.S.C. § 706(2) of the Administrative Procedure Act, claiming that EPA's approval of TMDLs for six watersheds was arbitrary and capricious, an abuse of discretion, or contrary to law because the TMDLs for each watershed did not include TMDLs for waters impaired by ionic toxicity. The district court found that the APA claims were "subsumed by the [Clean Water Act] claims and are duplicative," and granted summary judgment in favor of EPA on those claims. Neither party raises these APA claims on appeal.

6

We review standing determinations *de novo*. *United States v. Phillips*, 883 F.3d 399, 403 (4th Cir. 2018). To meet the constitutional minimum for standing, a plaintiff must allege: (1) injury in fact; (2) traceability; and (3) redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). EPA argues that Plaintiffs have failed to establish the first element — injury in fact — with respect to some of the challenged waters. The "injury-in-fact" prong of this test requires that a plaintiff suffer an invasion of a legally protected interest, which is concrete and particularized, as well as actual or imminent. *Id*. at 560.

Plaintiffs' challenge encompasses 573 biologically impaired waters located within 26 of West Virginia's "watersheds."[2] To establish injury in fact, Plaintiffs submitted declarations asserting that biological impairment diminished their use and enjoyment of a subset — approximately 50 — of the challenged waters. These waters are located throughout the State and span 23 of the 26 watersheds affected by this suit. On appeal, EPA argues that Plaintiffs have standing only with respect to this subset of impaired waters. EPA contends that to establish injury in fact as to the remaining challenged waters, Plaintiffs must allege a specific interest in *each* of them.

While it is true that Plaintiffs must allege that they suffered an injury-in-fact and that their injury must be causally connected to the conduct complained of, *Lujan*, 504 U.S. at 560; *see also Lewis v. Casey*, 518 U.S. at 343, 357 (1996), they have done so for

---

[2] A "watershed" is a geographic area that drains to a common body of water, such as a stream, lake, wetland, or the ocean. West Virginia has 32 major watersheds.

many of the streams and therefore have standing to challenge EPA's conduct at least with respect to them. Because of our ruling on the merits, we need not determine the scope of relief that may be afforded, as questioned by EPA.

IV.

We turn to the grant of summary judgment, which we review *de novo*. *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). EPA does not challenge, or take any position on, the validity of the constructive submission doctrine. Rather, EPA only argues that the facts of this case do not warrant application of that doctrine.

A.

The constructive submission doctrine rests on 33 U.S.C. § 1313(d)(2), which requires EPA to act within thirty days of a state's TMDL submission. Several circuits have concluded that a prolonged failure "by a state to submit TMDLs will be construed as a constructive submission of no TMDLs, which in turn triggers EPA's nondiscretionary duty to act." *See S.F. Baykeeper v. Whitman*, 297 F.3d 877, 881 (9th Cir. 2002); *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir. 1984). "If the EPA approves [the constructive submission of no TMDLs] . . . the next step for a dissatisfied party would be to seek judicial review of the EPA's action. If EPA disapproves, it then presumably would be under a mandatory duty to issue its own [TMDLs]." *Scott*, 741 F.2d at 997.

Courts that have endorsed this doctrine note that without it, states could refuse to promulgate their own TMDLs and therefore easily frustrate "an important aspect of the

8

federal scheme of water pollution control." *See, e.g.*, *id.* Given that Congress conferred substantial regulatory powers on EPA, these courts think it "unlikely" that Congress "failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals." *See, e.g.*, *id.* at 997 (internal quotation marks and citation omitted).

A number of courts have recognized the existence of the "constructive submission" doctrine. For example, in *Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir. 2001), the Tenth Circuit explained that the doctrine applies only where a state "clearly and unambiguously" expresses a decision not to submit TMDLs. Because Oklahoma had submitted *some* TMDLs and established a schedule to complete its remaining TMDLs, the court could not find that the state had abdicated its responsibility. *Id*. at 1022–24.

Similarly, in *San Francisco Baykeeper*, the Ninth Circuit concluded that to trigger this doctrine, a state must "clearly and unambiguously" indicate that it will not "submit any TMDLs and has no plans to remedy this situation." 295 F.3d at 882. California, however, had completed more than 46 TMDLs, agreed with EPA to complete all TMDLs within a dozen years, and allotted $7 million to its TMDL program annually. The Ninth Circuit therefore refused to apply the constructive submission doctrine. *Id.* at 880–83.

Other courts to address this issue have reached similar conclusions. *See Nat. Res. Def. Council, Inc. v. Fox*, 93 F. Supp. 2d 531, 540–42 (S.D.N.Y. 2000) (constructive submission doctrine inapplicable because, during the pendency of the lawsuit, New York submitted some TMDLs, formulated a plan for finishing them, and "demonstrated its good-faith interest in collaborating with EPA to bring the State's TMDL program to

9

completion"), *aff'd in part and vacated in part on other grounds sub nom. Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91 (2d Cir. 2001); *Sierra Club v. Hankinson,* 939 F. Supp. 865, 872 n.6 (N.D. Ga. 1996) (same, where state had submitted some, "albeit totally inadequate," TMDLs); *Idaho Sportsmen's Coal. v. Browner,* 951 F. Supp. 962, 967–68 (W.D. Wash. 1996) (same, where Idaho had established three TMDLs and proposed a schedule for completion of additional TMDLs); *Sierra Club, N. Star Chapter*, 843 F. Supp. at 1314 (same, since Minnesota had "identified TMDLs that it believes should receive the highest priority," "initiated work on developing those TMDLs," and "implemented some TMDLs").

Although the above courts have recognized the validity of the constructive submission doctrine, only one published opinion has applied the doctrine to force EPA action. *See Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422 (W.D. Wash. 1991), *aff'd sub nom. on other grounds Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994). There, it was "undisputed" that in the ten years since the identification of the challenged waters, "the State ha[d] not submitted a single TMDL to the EPA" and had "failed to complete even the first stage of the TMDL process." *Id*. at 1425. For these reasons, the district court found that Alaska had constructively submitted no TMDLs, triggering an EPA duty to do so. *Id.* at 1429.

B.

Courts therefore have declined to find a "constructive submission" of no TMDLs where a state (1) has produced at least some TMDLs *and* (2) has a credible plan in place to produce others. *See, e.g.*, *Hayes*, 264 F.3d at 1024. West Virginia has done both.

10

First, the State has established some TMDLs that address biological impairments. Plaintiffs concede that West Virginia has developed pollutant-specific TMDLs that may mitigate biological impairment, but argue that these steps do not directly address ionic toxicity or the State's narrative biological impairment criteria. While this may be true, West Virginia's actions cannot be construed as a clear abdication of its responsibilities with respect to the biologically impaired waters.

Second, the Memorandum of Agreement between EPA and West Virginia demonstrates that West Virginia has a plan to develop and implement biological impairment TMDLs, including for ionic toxicity.[3] West Virginia has similarly acknowledged its obligations under the Clean Water Act and has repeatedly stated that it "agrees" it must develop TMDLs "for all 303(d) listed impairments," including biological impairments. Although the State Agency is not scheduled to complete all of the TMDLs at issue here until June 30, 2026, West Virginia has committed to "develop TMDLs as soon as practicable." We recognize that EPA has reserved the right to withdraw from this Agreement pending the results of this litigation. But we credit EPA's assurances that it

---

[3] EPA clarified at oral argument that it approved West Virginia's constructive submission of no TMDLs contingent on the State meeting the deadlines set forth in the Memorandum of Agreement. Oral Argument at 43:10–46:00, *Ohio Valley Environmental Coalition v. Pruitt*, __ F.3d __ (4th Cir. 2018) (No. 17-1430), http://coop.ca4.uscourts.gov/OAarchive/mp3/17-1430-20180508.mp3.

will make good-faith efforts to continue to implement the Agreement as written to ensure that West Virginia meets the target completion dates. [4]

The Clean Water Act itself requires only that each state submit its TMDLs "from time to time" and "in accordance with [its] priority ranking." 33 U.S.C. § 1313(d)(1)(c), (d)(2). It may well be, as the district court concluded, that West Virginia has used SB 562 to delay the development of TMDLs for biologically impaired waters. But, thus far, these postponements have not *yet* amounted to a constructive submission of no TMDLs as recognized by other courts. Continued intransigence could change that. As of now, however, we cannot conclude that West Virginia has "clearly and unambiguously" refused to submit TMDLs in violation of the Clean Water Act. *See Hayes*, 264 F.3d at 1024.

Because West Virginia has demonstrated that it is making — and will continue to make — good-faith efforts to comply with SB 562, *and* because West Virginia has a credible plan in concert with EPA to produce ionic toxicity TMDLs, we hold that if the constructive submission doctrine were to apply, a decision we do not reach, it would not be satisfied here.

_____

[4] TMDLs may require substantial time and resources to develop. EPA guidance recommends that states establish TMDLs for all impaired waters on their Section 303(d) Lists within eight-to-thirteen years of the initial listing. But this EPA guidance recognizes that shorter or "slightly longer" times may be needed depending on specific factors and circumstances. Given that the waters at issue in this litigation were listed as biologically impaired from 2002 through 2008, West Virginia's timeline is not completely out of line with this EPA guidance.

## V.

The district court's order granting summary judgment in favor of Plaintiffs is therefore

*REVERSED.*