**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1111**

6TH CONGRESSIONAL DISTRICT REPUBLICAN COMMITTEE,

        Plaintiff – Appellee,

   and

ANNE TAETZSCH FITZGERALD, individually and as Chairman of the 20th House of Delegates District Republican Committee; KAREN U. KWIATKOWSKI, individually; EDWARD A. YENSHO, individually and as Chairman of the Green County Republican Committee; 20TH HOUSE OF DELEGATES DISTRICT REPUBLICAN COMMITTEE,

        Plaintiffs,

   v.

JAMES B. ALCORN, in his official capacity as Chairman of the Virginia State Board of Elections; CLARA BELLE WHEELER, in her official capacity as Vice-Chairman of the Virginia State Board of Elections; SINGLETON B. MCALLISTER, in her official capacity as Secretary of the Virginia State Board of Elections; VIRGINIA DEPARTMENT OF ELECTIONS,

        Defendants - Appellants.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Michael F. Urbanski, Chief District Judge.  (5:17-cv-00016-MFU-JCH)

Argued:  December 12, 2018            Decided:  January 9, 2019

Before WILKINSON, MOTZ, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Duncan joined.

———————————

**ARGUED:** Toby Jay Heytens, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Jeffrey R. Adams, WHARTON, ALDHIZER & WEAVER, PLC, Harrisonburg, Virginia, for Appellee. **ON BRIEF:** Mark R. Herring, Attorney General, Stephen A. Cobb, Deputy Attorney General, Matthew R. McGuire, Principal Deputy Solicitor General, Michelle S. Kallen, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Charles F. Hilton, Thomas E. Ullrich, Lucas I. Pangle, WHARTON ALDHIZER & WEAVER, PLC, Harrisonburg, Virginia; John C. Wirth, NELSON MCPHERSON SUMMERS & SANTOS, Staunton, Virginia, for Appellee.

———————————

WILKINSON, Circuit Judge:

The 6th Congressional District Republican Committee argues that Virginia's Incumbent Protection Act, Va. Code Ann. § 24.2-509(B), violates the First Amendment of the Constitution. The district court agreed and enjoined § 24.2-509(B) in its entirety. For the reasons that follow, we now affirm.

I.

A.

Virginia law generally allows the Commonwealth's political parties considerable discretion in deciding how to nominate their candidates for office. Section 24.2-509(A) empowers the "duly constituted authorities" of the state and local parties "to determine the method by which a party nomination . . . shall be made." The parties make use of this latitude. For example, the Republican Party of Virginia, with whom the appellee here is affiliated, allows for four different methods of nomination: a primary, a party canvass, a convention, and a mass meeting. *Fitzgerald v. Alcorn*, 285 F. Supp. 3d 922, 927 (W.D. Va. 2018). Under the Party's Plan of Organization, committees established in every locality, state legislative district, and congressional district are empowered to choose among these methods to nominate candidates for their political subdivision. J.A. 37, 38, 40.

The differences between these methods are substantial. Each one "'create[s] a different distribution of potential voters (or decision makers) in the nomination process.' For example, primaries involve the largest pool of potential voters, whereas conventions and mass meetings 'lend themselves more toward committed partisans.'" *Alcorn*, 285 F.

3

Supp. 3d at 935 (quoting J.A. 884-85, 885-86). The choice of method, therefore, could have a significant influence on the choice of nominee.

Subsection 24.2-509(B), often called the Incumbent Protection Act, however, limits the broad authority recognized by subsection A.[1] The second and third sentences apply to those subdivisions of the state party that select nominees for candidates to the

---

[1] The full text of Virginia Code § 24.2-509 is reprinted below, with the sentences in subsection B numbered for ease of reference:

A. The duly constituted authorities of the state political party shall have the right to determine the method by which a party nomination for a member of the United States Senate or for any statewide office shall be made. The duly constituted authorities of the political party for the district, county, city, or town in which any other office is to be filled shall have the right to determine the method by which a party nomination for that office shall be made.

B. [1] Notwithstanding subsection A, the following provisions shall apply to the determination of the method of making party nominations. [2] A party shall nominate its candidate for election for a General Assembly district where there is only one incumbent of that party for the district by the method designated by that incumbent, or absent any designation by him by the method of nomination determined by the party. [3] A party shall nominate its candidates for election for a General Assembly district where there is more than one incumbent of that party for the district by a primary unless all the incumbents consent to a different method of nomination. [4] A party, whose candidate at the immediately preceding election for a particular office other than the General Assembly (i) was nominated by a primary or filed for a primary but was not opposed and (ii) was elected at the general election, shall nominate a candidate for the next election for that office by a primary unless all incumbents of that party for that office consent to a different method.

[5] When, under any of the foregoing provisions, no incumbents offer as candidates for reelection to the same office, the method of nomination shall be determined by the political party.

[6] For the purposes of this subsection, any officeholder who offers for reelection to the same office shall be deemed an incumbent notwithstanding that the district which he represents differs in part from that for which he offers for election.

4

General Assembly. Those sentences allow incumbent members of the General Assembly who are running for reelection, where there is only one incumbent, to "designate[]" the method of nomination they prefer. Under this statute, the wishes of the party are immaterial; no matter where the party's plan of organization may vest the power to choose nomination methods, the law trumps, granting the power to the incumbent.

The fourth sentence of the Act applies to those components of political parties that make the nominations for "particular office[s]" other than for the General Assembly, including nominations for the U.S. House of Representatives. In these races, the incumbent officeholder may insist that his or her party use a primary as its nomination method as long as (1) the incumbent was selected by primary in the previous election cycle and (2) the incumbent is running for reelection. Again, the statute trumps the party's plan of organization, which, in this case allows the committees responsible for congressional nominations to choose between the approved methods (excluding mass meetings) without interference by the incumbent, J.A. 37.

The Virginia Department of Elections, however, has not always respected the distinction made between the second and third sentences on the one hand, and the fourth sentence on the other. In the 2016 and 2017 election cycles, for example, the Department promulgated forms that allowed non-General Assembly incumbents to "designate" their preferred method of nomination as if their elections were governed by the second and third sentences. After the commencement of this litigation, and only after the appellees pointed out the mistake, the Department issued new forms that applied the fourth sentences to these races.

5

Virginia has not identified a single other state that has a statute like the Incumbent Protection Act, and this is not the first case to consider a constitutional challenge to it. In 2007, for example, this court considered a challenge to the Act. *Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007) ("*Miller II*"). There, we held that an incumbent cannot constitutionally force his or her party to use an *open* primary, as this would be an impermissible burden on the party's associational rights. *Id.* at 368-71. We did not, however, reach the different question of the constitutionality of incumbents' statutory power to dictate *any* nomination method.

B.

This appeal stems from the 6th Congressional District Republican Committee's challenge to the Incumbent Protection Act under 42 U.S.C. § 1983. See *Alcorn*, 285 F. Supp. 3d at 922. The Committee is responsible for nominating candidates for the U.S. House of Representatives for the 6th Congressional District, which "covers much of the west-central portion of Virginia, from Roanoke to Front Royal." *Id*. at 927. Under the Party's Plan of Organization, it is composed of the "District Chairman," the "Unit Chairman" (the chair of each relevant locality's committee), the "District Representative of the Virginia Federation of Republican Women," the "Young Republican Federation District Committeeman," the "College Republican Federation District Committeeman," and the "District members of the State Central Committee." J.A. 36-37. The Committee, along with other plaintiffs who were dismissed from the suit and do not appeal, raised facial and as applied challenges to the Incumbent Protection Act, claiming that it abridged their rights under the First and Fourteenth Amendments of the U.S.

6

Constitution. The named defendants include the Virginia Department of Elections and the three members of the Virginia State Board of Elections at the time the suit was filed. *Alcorn*, 285 F. Supp. 3d at 928.

The district court, relying on *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006) ("*Miller I*"), found that the Committee had standing to challenge the Act. *Alcorn*, 285 F. Supp. 3d at 937. It then proceeded to evaluate the burden posed by § 24.2-509(B) on the Committee's associational rights, concluding that it was "severe" because it provided "incumbents with a statutory right to dictate political parties' internal affairs . . . ." *Id.* at 952. The burden was "especially" onerous because it trespassed on the "realm of selecting candidates." *Id.* Given the magnitude of the burden, the district court found that "the Act can survive constitutional scrutiny only if it is 'narrowly tailored to advance a compelling state interest.'" *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). The district court ultimately concluded that the Act did not survive such scrutiny. *Id.* at 953.

The district court thus permanently enjoined enforcement of the entire Incumbent Protection Act on January 19, 2018. J.A. 1473. The court enjoined all six sentences of § 24.2-509(B) because, according to the court, the second and third sentences—which protect the nomination prerogatives of incumbent General Assembly members—could not be severed from the fourth—which protects the nomination prerogatives of, inter alia, members of Congress. The court additionally found that the Committee had standing to challenge the second and third sentences under the overbreadth doctrine. *Alcorn*, 285 F. Supp. 3d at 955. Finally, the district court concluded that the Act had "no legitimate

7

sweep" and so a facial challenge to all its provisions was appropriate. *Id.* at 955-56. After the notice of appeal had been filed, the district court stayed its permanent injunction order on February 5, 2018, to avoid interfering with the ongoing nomination cycle. J.A. 1481. After that cycle concluded, however, the district court vacated its stay on September 24, 2018. J.A. 1680. During the course of this appeal, the Department filed a motion to vacate the injunction on the basis of mootness. We held that motion in abeyance pending oral argument, and both parties expanded on their arguments in their briefing on the merits.

## II.

The district court found that the fourth sentence of the Incumbent Protection Act, which protects the nomination prerogatives of incumbent members of Congress among others, violated the First Amendment. Because this provision imposes a severe burden on the associational rights of Virginia's political parties, and because the Commonwealth has been unable to show that it is narrowly tailored to serve a compelling state interest, we agree.

## A.

Freedom of association has, for centuries, been at the heart of the American system of government and individual rights. In 1831, when Alexis de Tocqueville arrived in the United States, he was shocked to discover that our nation was the only "country on the face of the earth where the citizens enjoy unlimited freedom of association for political purposes." Alexis de Tocqueville, 2 *Democracy in America* 123 (Henry Reeves trans., 1863). In America, "the most democratic country on the face of the earth," the

8

"art" of forming political associations had been "carried to the highest perfection." *Id.* at 115. Because of this, "Americans of all ages, all conditions, and all dispositions, constantly form associations." *Id.* at 114.

De Tocqueville identified this propensity to associate as one of the sources of the astonishing political dynamism of the young Republic, writing that American political associations are "the mother of action," *id.* at 125, and that they "stimulate competition, and . . . discover those arguments which are most fitted to act upon the majority." *Id.* at 210. The right to associate for political purposes, de Tocqueville proclaimed, is "[t]he most natural privilege of man, next to the right of acting for himself." *Id.* at 209. Accordingly, "the right of association is almost as inalienable as the right of personal liberty. No legislator can attack it without impairing the very foundations of society." *Id.*

The multiplicity of political associations lauded by de Tocqueville was the result of the Founders' decision to enshrine the "freedom to join together in furtherance of common political beliefs" in the First Amendment of the Constitution. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986). That Amendment promises Americans the right not just to proclaim a political vision but to join with their compatriots and actually advance that vision. Because, while an individual may be, in de Tocqueville's words, "feeble and consequently more incapable of preserving his freedom," de Tocqueville, *supra*, at 123, when individuals combine in association they "acquire facility in prosecuting great undertakings in common," *id.* at 114. Some of the "great undertakings" accomplished by political associations protected by the First Amendment include the Abolitionist Movement, the Women's Suffrage Movement, the

9

Labor Movement, and the Civil Rights Movement—the fruits of which continue to shape our politics and society for the better to this day.

Of all political associations protected by the First Amendment, political parties themselves merit special attention. Like other political participants, parties advance a particular vision. Unlike others, however, political parties must also nominate candidates for office, compete in elections, and, if successful, help to translate campaign appeals into programmatic action. In so doing, political parties provide a vehicle for voters to advance their own political views. Without groups like modern political parties, "[r]epresentative democracy in any populous unit of governance" would be "unimaginable." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).

Perhaps no function of a party is more central to its purpose than the selection of candidates for office, which "often determines the party's positions on the most significant public policy issues of the day." *Id.* at 575. It is no surprise, therefore, that the Supreme Court is "vigorous[]" in affirming the "special protection" owed to the associational rights of political parties as they pertain to the parties' choice of nominees. *Id*. at 576. Statutes that severely burden a party's associational rights must be narrowly tailored to advance a compelling government interest. *Id.* at 581-82. In *Democratic Party of the United States v. Wisconsin ex rel. La Follette*, the Court invalidated a Wisconsin law that required the national Democratic Party to seat certain delegates chosen in an open primary. 450 U.S. 107 (1981). In *Tashjian v. Republican Party of Connecticut*, the Court struck down a Connecticut law that forbade state parties from conducting open primaries because the law burdened "associational opportunities at the crucial juncture at

10

which the appeal to common principles may be translated into concerted action . . . ." 479 U.S. at 216. In *Eu v. San Francisco County Democratic Central Committee*, the Court invalidated laws dictating political parties' internal affairs and prohibiting them from endorsing candidates for office. 489 U.S. 214 (1989). And in *California Democratic Party v. Jones*, the Court struck down a mandatory open primary law as it burdened the "political association's right to exclude" in the "candidate-selection process." 530 U.S. at 575.

Not every burden on associational rights is unconstitutional. "States have a major role to play in structuring and monitoring the election process, including" nominee selection. *Cal. Democratic Party*, 530 U.S. at 572. Where the burden imposed by the state is not "severe"—where it is "lesser"—courts engage in "less exacting review." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). In *Timmons*, the Court upheld a Minnesota law that prohibited a candidate from appearing on the ballot as the nominee of more than one party after finding that the law did "not severely burden that party's associational rights." *Id*. at 359. Nothing prevented the party from endorsing the candidate of another party; nothing prevented the party for campaigning for the candidate of another party. The law's only effect was to "reduce the universe of potential candidates who may appear on the ballot as the party's nominee . . . by ruling out those few individuals who . . . have already agreed to be another party's candidate." *Id.* at 363. This slight a reduction could not be a severe burden. *Id.*; see also *Clingman v. Beaver*, 544 U.S. 581 (2005) (upholding law mandating a "semiclosed" primary, in which registered members of opposing parties and unaffiliated voters could not participate).

11

Political parties have, of course, come in for their fair share of criticism throughout our history. Chancellor James Kent, in an 1830 letter to Daniel Webster, wrote that "Hamilton said in the Federalist, in his speeches, and a hundred times to me, that factions would ruin us, and our government had not sufficient energy and balance to resist the propensity to them, and to control their tyranny and their profligacy." John B. Cassoday, *James Kent & Joseph Story*, 12 Yale L.J. 146, 151 (1903) (quoting letter). But whether the divisiveness in public discourse traces to the presence of political parties or to the divisions inherent in the issues themselves elides the fact that parties have long since become a fact of constitutional life. And what emerges from the above Supreme Court cases is no all-or-nothing proposition but instead that law is not insensitive to matters of degree: Those laws that impose a "heav[y]" or "severe" burden on a political party's right to choose its nominee are unconstitutional unless they serve a "compelling state interest" and are "narrowly tailored" to do so. *Cal. Democratic Party*, 530 U.S. at 583. It is to that inquiry that we now turn.

## B.

The fourth sentence of Virginia Code § 24.2-509(B), the provision of the Incumbent Protection Act that applies to congressional incumbents among others, unquestionably poses a severe burden on the associational rights of the Commonwealth's political parties. In evaluating the law's imposition on associational rights, we must "weigh the 'character and magnitude' of the burden" it occasions. *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). We keep in mind also that "[a]ny interference

12

with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Tashjian*, 479 U.S. at 215 (quoting *Democratic Party*, 450 U.S. at 122).

Subsection 24.2-509(A) grants the "duly constituted authorities" of the Commonwealth's political parties considerable discretion in selecting the method of choosing their nominees. The Incumbent Protection Act, subsection 24.1-509(B), carves exceptions to this rule in favor of incumbents. To recapitulate, the second and third sentences allow incumbent members of the General Assembly to dictate the method their party shall use in selecting the nominee for the office that incumbent holds. The fourth sentence allows incumbent members of the U.S. House of Representatives, who were themselves nominated by primary in the last election cycle, to require their party to use a primary in the current election cycle to nominate a candidate for the office they hold if they themselves are seeking reelection. In short, the associational rights of Virginia's political parties that are recognized and protected by § 24.2-509(A) are taken away by § 24.1-509(B) and given instead to a single individual—the incumbent.

The weight of this burden could not be more obvious. The members of the 6th Congressional District Committee have, as generations of Americans did before them, banded together to advance their political views. The selection of a nominee "often determines" the contours of the party platform. *Cal. Democratic Party*, 530 U.S. at 575. And "even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id.* Yet, at the "crucial juncture" at which the members of this political association decide how to select their nominee, *id.*, the Commonwealth has taken the decision out of their

13

hands: No matter what method of nomination the members of this party may prefer, Virginia law decrees that they must give way to the desire of the incumbent to hold a primary if that incumbent was himself selected by primary previously and is seeking reelection.

The burden is manifestly severe. This is not a case like *Timmons*, in which a party's ability to choose a nominee was reduced by only the small number of individuals that already appeared elsewhere on the ballot. 520 U.S. at 351. Nor is this a case like *Clingman*, in which the state's Libertarian Party was required by state law to allow only its registered members and registered independent voters to participate in its primary. 544 U.S. at 592. The burden there was not severe given the ease with which registered members of other parties who wanted to participate in the Libertarian primary could change their registration. *Id.* Rather, this is a case in which the state has decided that the wishes of a party's adherents must, in certain circumstances, be subordinated wholesale to the wishes of a single individual whose self-interest is self-evident; in these circumstances, the party's adherents are *entirely* shut out of the choice of nomination method—severely burdening their associational rights.

C.

Because the provision of the Incumbent Protection Act which protects congressional incumbents—the fourth sentence—imposes a "severe" burden on the associational rights of Virginia's political parties, the Commonwealth must show that it is "narrowly tailored to serve a compelling state interest." *Cal. Democratic Party*, 530 U.S. at 583. It cannot make this showing.

14

Primaries add a crucial participatory dimension to democratic politics. Appellants assert that § 24.2-509(B) is akin to a mandatory primary statute, and therefore it serves the interest of "assur[ing] that intraparty competition is resolved in a democratic fashion." *Id.* at 572. If § 24.2-509(B) truly were a mandatory primary statute its constitutionality would be "too plain for argument." *Id.* (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974)). But it is not: The statute does not by itself require any organ of a Virginia political party to use a primary as a method of nomination. Instead, the statute delegates the power to force the party to use a primary to the incumbent office holder. Therein lies the constitutional flaw.

This delegation of power over the party to the incumbent office holder is not narrowly tailored to meet the Commonwealth's asserted interest. Under the terms of the statute, the interest in democratic resolution of intraparty disputes will only be vindicated when and where an incumbent office holder decides that it is in his interest to do so. It is implausible that the General Assembly would seek to vindicate this interest in such an odd, uneven, and underinclusive fashion. Instead, the text and structure of the law gives rise to the strong suggestion that the Incumbent Protection Act serves a different interest: the interest, unsurprisingly, in incumbent protection.

To be sure, incumbent protection is not per se an unconstitutional interest. In the context of redistricting, the Supreme Court has historically allowed maps to stand that were drawn with the electoral interest of incumbents in mind. See, *e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). But the Court has not held that the interest in incumbent protection is a compelling one that can justify such direct intrusions on the

15

First Amendment. See *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (Kagan, J., concurring) (explaining that the Court did not address the First Amendment challenge to the redistricting). Incumbent protection is simply not a strong enough interest here to justify the severe burden on the appellee's associational rights.

Incumbents, after all, are already blessed with myriad de facto advantages in the electoral arena. Appellee's expert, Professor Jeffrey A. Jenkins, testified that incumbents generally have better name recognition than challengers because of their time in the public eye. J.A. 884. Incumbents also have the opportunity to win votes by enacting popular laws and servicing their constituents, and they have easier access to donors, as they are proven winners. *Id.* All this contributes to the "scare-off" effect: potential challengers, faced with the seemingly insurmountable hurdles, will decide not to run. *Id.*

The other reason for incumbency advantage is more salutary. Voters may recognize that incumbents provide our government with institutional memory and the wisdom that can only be won through experience. In the legislative branch, which could find itself at a disadvantage when dealing with career officials and agency specialists of the executive, the cumulative knowledge and experience brought by incumbents to the negotiating table is particularly valuable. In this sense, incumbency evens the interbranch playing field. Without it, novice legislators would find it more difficult to fulfill their constitutional responsibilities.

Thus, domination of the political parties by their incumbent office holders is, perhaps, a natural consequence of political reality. But to the already winning de facto hand dealt incumbents, § 24.2-509(B) adds a de jure ace: In the circumstances governed

16

by the fourth sentence, challengers would have to compete with already advantaged incumbents in a selection process chosen by the incumbent himself. This goes too far. It narrows the possibility of legislative renewal and refreshment through the infusion of new blood. It risks making the electoral process sclerotic.

Nothing in the foregoing analysis compromises the "major role" played by states in structuring their elections. *Cal. Democratic Party*, 530 U.S. at 572. Election administration is necessarily an amalgam of state law and party procedures, and the Commonwealth is surely correct that the rights of political parties in this amalgam are not absolute in character. We reiterate that "it is beyond question 'that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" *Clingman*, 544 U.S. at 593 (quoting *Timmons*, 520 U.S. at 358). Rather, we simply hold that a state may not force a political party to hand control over its nomination method to a single, self-interested individual; the private interest of an incumbent in winning reelection cannot, and certainly not in the manner chosen here, predominate over the associational rights of political parties.

### III.

The district court also enjoined enforcement of the Act's second and third sentences, which protect the nomination prerogatives of incumbent members of the General Assembly. The Commonwealth argues that this was improper, as the Committee lacked standing to challenge those provisions. We disagree. The Committee suffered cognizable, traceable, and redressable injury from the Commonwealth's application of those sentences to its activities. And the second and third sentences are, if anything, even

17

more offensive to the First Amendment than the fourth. Accordingly, we affirm the district court's decision to enjoin the second and third sentences on § 24.2-509(B) as well.

Standing requires an injury in fact that is caused by the challenged conduct and is likely to be redressed by a favorable decision. See *Ohio Valley Envtl. Coal., Inc. v. Pruitt*, 893 F.3d 225, 229 (4th Cir. 2018). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted). Throughout a lawsuit "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

The Committee suffered an injury in fact at the time the lawsuit was filed as a result of the Commonwealth's application of the second and third sentences, as demonstrated by the "specific facts" adduced in its submissions to this court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). These facts are as follows: The Department issues a series of forms for incumbents and party committees to notify the Commonwealth which nomination method they plan to use, as they are required to do by law. See Va. Code Ann. § 24.2-516. These forms reflect the Department's understanding of how to apply the Incumbent Protection Act. And yet, throughout the 2016 election cycle and through the filing of this lawsuit, these forms applied the Act's second and third sentences, which should only apply to incumbent members of the General

18

Assembly, to the 6th Congressional Committee as well. Incumbent members of Congress were given the same plenary power to designate *any* method of nomination no matter the circumstance, as if they were incumbent members of the General Assembly.

The forms themselves best tell the story:

**DESIGNATION OF METHOD OF NOMINATION**
for
**SENATE OF VIRGINIA**
2015
\* \* \*

I, the undersigned incumbent of the Senate of Virginia district indicated above, **am seeking re-election** and designate the following method of nomination to be used in determining the party's candidate for this office subject to the forthcoming November general election.

J.A. 892.

2016 **DESIGNATION OF METHOD OF NOMINATION**
\* \* \*

I, the undersigned incumbent of the district indicated above, **am seeking re-election** and designate the following method of nomination to be used in determining the party's candidate for this office subject to the coming November general election.

J.A. 873. The form used by incumbent General Assembly members in the 2015 election cycle and by incumbent Members of Congress in the 2016 election cycle are in all material respects the same. As the Committee noted, "[n]ot only did Appellants promulgate these forms, they directed non-General Assembly incumbents and party chairmen to use them." Resp. Br. of Appellee at 13.

It is plain therefore that, on those facts, the Committee suffered a sufficiently "concrete" injury in fact to sustain its challenge to the second and third sentences of the Act. Because of the forms, any candidate that the 6th Congressional Committee wished to

19

recruit, or anyone contemplating an electoral challenge to the incumbent, faced the prospect of having to compete in a nomination process selected by that incumbent. Plainly, this prospect would "dramatically change[] the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit." *Miller I*, 462 F.3d at 317. This distortion of political decisionmaking constitutes an ongoing and concrete injury sufficient to meet the injury-in-fact prong of constitutional standing analysis. *Id.* at 317-18.

That injury, of course, is particularized because the 6th Congressional Committee serves a unique function in selecting the Republican nominee for Virginia's 6th Congressional District. See *Lujan*, 504 U.S. at 560. The remaining standing analysis is straightforward: The injury was caused by promulgation of the forms based on the Act's second and third sentences, and therefore will be redressed if we find those sentences to be inconsistent with the First Amendment. For these reasons, the Committee has standing to challenge the portions of § 24.2-509(B) that protect the nomination prerogatives of General Assembly members.

In response, the Department argues that the challenge to the second and third sentences became moot when the Department updated the offending election forms.[2] But

---

[2] The Department also argues that plaintiff's challenge to the Act's fourth sentence is moot. It notes that because the current 6th District incumbent was selected by convention, the plaintiff will not be forced to accede to a primary until 2022 at the earliest. But that argument relies on the same cramped interpretation of standing that we rejected in *Miller I*, 462 F.3d at 316-18. The injuries inflicted by laws that distort the primary process, like the Incumbent Protection Act, are not confined to the short duration of any particular primary, but instead reflect the reality that "campaign planning decisions have to be made (Continued)

the update occurred after the lawsuit had been filed. Promulgating new forms may well have been the right thing to do in accordance with state law. But as a litigation tactic, such backpedaling will rarely serve to moot a case in federal court. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189-94 (2000). The mootness doctrine ordinarily does not extend to situations where a party quits its offending conduct partway through litigation. *Id.* After all, "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (internal quotation marks omitted). To overcome that general rule, the Department bears "[t]he heavy burden of persuading the court," *Laidlaw*, 528 U.S. 167, 189 (2000) (internal quotation marks and alterations omitted), that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Wall v. Wade*, 741 F.3d 492, 497 (2014) (quoting *Laidlaw*, 528 U.S. at 189).

The Department cannot carry this burden. It has a history of frequently revising the relevant election forms. The forms used for congressional nominations in 2014, for example, reflected the fourth sentence of the Incumbent Protection Act and not the second and third. Yet the congressional nomination forms were inexplicably changed for

---

months, or even years, in advance of the election to be effective." *Id.* at 317-18. The 6th Congressional Committee's claims thus did not become moot with the passing of the 2018 election season. The dispute over the Act's fourth sentence, rather, is alive and well. Even so, if the Department were correct that electoral disputes became moot with each passing election cycle, this challenge, like many electoral challenges, would plainly be capable of repetition yet evading review. See, *e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735-36 (2008).

the 2016 congressional elections to reflect the Act's more fulsome General Assembly protections instead. The Department has offered no explanation for why the forms were changed to the benefit of incumbents between the 2014 and 2016 congressional elections. Even though the forms apparently have been edited once again, we have little confidence that the forms will not revert back if we hold that this lawsuit is moot. Indeed, that danger is particularly acute when, as here, a change in the forms would confer benefits upon political incumbents. The Incumbent Protection Act transparently advances the interests of those who control the apparatus of government; it is hardly beyond the realm of plausibility that it would be administered with that same purpose in mind. The Department's May 23, 2018 Suggestion of Mootness is accordingly denied.

We may thus properly consider the 6th Congressional Committee's facial and as applied First Amendment challenges to the Incumbent Protection Act's protection of incumbent members of the General Assembly. A facial challenge to a law will succeed after a showing "that no set of circumstances exist under which the law would be valid, or that the law lacks any plainly legitimate sweep." *Greater Balt. Center for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc) (internal quotation marks and alterations omitted). In the First Amendment context, a facial challenge may also succeed under overbreadth doctrine. *Id.* But there is no need to employ overbreadth doctrine in this case, for the Act's second and third sentences cannot be applied in a manner consistent with the First Amendment.

The Department fails to identify a single circumstance where the Act's second and third sentences could be lawfully applied. And we find none. The second and third

22

sentences not only share the constitutional infirmities of the fourth sentence but exhibit those infirmities to an even greater degree. The fourth sentence allows some incumbents to force a primary under certain designated circumstances. The second sentence goes further by empowering incumbents to impose their choice of any method of nomination no matter what the party prefers under almost any circumstances.[3] These advantages, when given to state or federal incumbents, run afoul of the First Amendment for all the reasons discussed in detail in Part II, *supra*.

The Department raises yet one more challenge, arguing that the district court was wrong to enjoin the Incumbent Protection Act in its entirety. See Va. Code Ann. § 24.2-509(B). We review the district court's decision to enjoin the statute for abuse of discretion. *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 320 (4th Cir. 2010). The Act comprises six sentences. We have now found that each of its operative provisions—namely the second, third, and fourth sentences—is unconstitutional. The remaining sentences merely explain how to apply them. The district court did not abuse its discretion in enjoining the Incumbent Protection Act in toto.

## IV.

Our decision is a narrow one. It is directed at a discrete constitutional imbalance created by permitting single office holders to negate the associational rights of political parties in an area central to the party's very reason for being. Our ruling in no way limits

---

[3] The third sentence applies in the relatively rare situation where there is more than one incumbent for the same office. In that situation, the statute requires incumbents' consent for any method of nomination other than a primary. § 24.2-509(B).

the ability of states to enact "reasonable regulations of parties, elections, and ballots." *Timmons*, 520 U.S. at 358. The associational rights of political parties are, after all, not absolute. Laws that impose a slight or lesser burden on associational rights are owed deference, especially when justified by the need "to reduce election- and campaign-related disorder." *Id.* But our constitutional responsibility, set forth so plainly by the Supreme Court, requires us to ensure that this "deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 402 (2000) (Breyer, J., concurring). The Incumbent Protection Act reflects precisely that infirmity, and it is precisely why we cannot allow the Act to stand.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*